## In the UNITED STATES DISTRICT COURT for the DISTRICT of KANSAS

Kent Thomas Warren,

Plaintiff

v.                                        **Case:** 5:19-cv-04094-SAC-ADM

University of Illinois-Champaign/Urbana,

University of Arizona-Tucson,

Southern Illinois University-Carbondale,

Northern Arizona University-Flagstaff,

Western Governors University-Utah,

Defendant(s)

## CIVIL COMPLAINT

### I.     Parties:

**A. Plaintiff:**

Kent Thomas Warren

1301 W. 24th St. E18

Lawrence, KS 66046

785-592-0259

warrenknt@aol.com

### I.     Defendant(s):

**1. University of Illinois-Champaign/Urbana**

Attention: President's Office-Urbana

President Timothy L. Killeen

364 Henry Admin. Bldg.

506 S. Wright St., MC-346

Urbana, IL 61801

## 2. University of Arizona-Tucson

Attention: Dr. Robert C. Robbins-President

Old Main, Room 200

1200 East University Boulevard

P.O. Box 210021

Tucson, Arizona 85721-0021

## 3. Southern Illinois University-Carbondale,

Southern Illinois University System

Office of the President-SIUP, J. Kevin Dorsey M.D., Ph.D.

1400 Douglas Drive

Carbondale, IL 62901

Mailcode: 6801

## 4. Northern Arizona University-Flagstaff

Attention: President Rita Cheng

P.O. Box 4092

Flagstaff, AZ 86011

## 5. Western Governors University-Utah

Western Governors University

Attention: WGU President Scott D. Pulsipher

4001 South 700 East, Suite 700

Salt Lake City, UT 84107

## II.     Jurisdiction:

A. (If Applicable) Diversity of citizenship and amount:

1. Plaintiff is a citizen of the State of Kansas.

2. The first- and third-named defendant(s) above is...

    b. a corporation incorporated under the laws of the State of
Illinois and having its principal place of business in a State other
than the State of which plaintiff is a citizen.

3. The second- and fourth-named defendant(s) above is...

    b. a corporation incorporated under the laws of the State of  Arizona
and having its principal place of business in a State other than the
State of which plaintiff is a citizen.

4. The fifth-named defendant above is...

    b. a corporation incorporated under the laws of the State of Utah and having its principal place of business in a State other than the State of which plaintiff is a citizen.

Plaintiff states that the matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars ($75,000.00).

B.1.This case arises under the following section of the Constitution of the United States or statute of the United States (28 U.S.C. 1331):

    42 U.S.C. §2000d, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance".

2. This case arises because of violation of the civil or equal rights, privileges, or immunities accorded to citizens of, or persons within the jurisdiction of, the United States (28 U.S.C. 1343):

"(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

## III. Statement of Claim.

### A. Facts.

1. Plaintiff graduates from Secondary School (Doc. 1. Secondary School Transcript) and enters the University of Illinois-Champaign/Urbana (Doc. 2. Admissions Application) in 1989, (Doc. 3. U of I Transcript);

the University of Illinois-Champaign/Urbana's admissions
application does not contain information required for work and/or life
experience equitable to degree standing, or applicable equitable
knowledge, skills and/or training; plaintiff speculates this may be a
condition for assessment and/or fundamental liberties and continues
baselines incorporated as a child, see below; plaintiff is compelled to
repeat all or nearly all the courses previously administered by
plaintiff's secondary school with texts and/or materials, in at least
one course identical, similar to University of Illinois' program; in
1995, Plaintiff is readmitted, then withdraws, from the University of
Illinois-Champaign/Urbana (Doc. 1. Secondary School Transcript and
Doc. 3. U of I Transcript).

2. In 1999, plaintiff enters University of Arizona-Tucson and takes a
course identical to training taken in employment with only one
discrepancy, writing a behavior management plan-SER 402 (Doc. 4.
U of A Transcript); the admissions application does not take into
consideration professional level knowledge, skills, trainings,
experience.

Case 3:09-cv-00485-MJR-DGW Document 1 Filed 06/30/09 Page 7 of 37

3. In 2006, plaintiff enters Southern Illinois University-Carbondale

   SIU-C, (Doc. 5. SIU-C Transcript) ; the admissions application does

   not take into consideration professional level knowledge, skills,

   trainings, experience; in 2007, plaintiff withdraws from Southern

   Illinois University-Carbondale; plaintiff asked for due process, prior

   to entrance, and was declined and/or ignored by admissions and the

   College of Education; plaintiff was informed of due process

   safeguards, equal protection, and a biased assessment, in a course for

   Early Childhood Education, all reasons for plaintiff's request for due

   process (Doc. 6. Safeguards and Assessment); plaintiff also

   researched 8 C.F.R. §214 et seq. and Messick's view of validity,

   noting context may alter assessment, ("requirement" imposed by the

   State of Illinois at this time) (Doc. 7. Messick); plaintiff researched 59

   Il. Ad. §132.25 and noticed permitted applications for those with

   work experience equivalent to that of a degree holder for a mental

   health professional (both credentials from Arizona, see below, and

   Illinois can be considered to be diploma mills on their face-unknown

   to plaintiff if the State offered formal trainings; no formal trainings

   were offered by the perspective employer(s)); plaintiff pursued

7

confirmation of attainment through application and textual references from universities after application either through work or life experience.

4. Plaintiff moved to a homeless shelter in Tucson, Arizona in 2007; plaintiff again transitions to an apartment (similar to Carbondale transition) after finding employment; plaintiff re-enters University of Arizona-Tucson, in 2010, the admissions application does not take into consideration professional level knowledge, skills, trainings, experience; plaintiff was banned from the College of Education- he asked for due process, work/life experience, too many times and it was obvious he didn't want to complete a program of study, sent by electronic communication from the office of the College of Education, nearly verbatim (plaintiff also deleted email in frustration), and subsequently withdraws (Doc. 4. U of A Transcript); this declination of experience occurred simultaneously with the College of Education offering teacher certification to individuals while teaching English in a foreign country (Canada and a Spanish speaking country was offered); plaintiff was provided information in an introductory course stating a nonbiased, multifactored evaluation is a requirement for

IDEA, Individuals with Disabilities Education Act, Principles of IDEA, Heward, William L.; *Exceptional Children: An Introduction to Special Education, Ninth Edition*; Pearson Education, Inc.; Upper Saddle River, New Jersey, 2009- 20 U.S.C. §1414 (b)(3)(A)(iii)-valid and reliable assessment for those receiving funding; plaintiff researched Arizona, R9-20-201 A.6. and R9-20-101 (17), R9-20-101 (18), both later repealed (Doc. 8. Arizona Statutes (Excerpts)); plaintiff also purchases a curriculum for English Language Learners at this point in time meeting all to nearly all standards, lesson plans, and protocols cited within the texts.

5. Plaintiff moved to a homeless shelter in Flagstaff, Arizona and transferred to Northern Arizona University-Flagstaff (Doc. 9. NAU Transcript); the admissions application does not take into consideration professional level knowledge, skills, trainings, experience; plaintiff retrieves a textbook from the 1960's by Georgia Sachs Adams in consult. with Theodore L. Torgerson, *Measurement and Evaluation in Education, Psychology, and Guidance* (Holt, Rinehart, and Winston, 1964)(Library of Congress Card Number 64-21407); this textbook states on page 95 "No arbitrary standards can

be established regarding satisfactory levels for reliability coefficients" and on page 103, and "For a test to be valid, that is, to provide a sound basis for judgments, it must measure "something" with reasonable reliability, and that "something" must either be a sample of the behavior we wish to measure or it must have demonstrated relevance to that behavior" (Doc. 10. Sachs Adams); plaintiff couldn't find sustainable work in Flagstaff, Arizona and moved to a homeless shelter in Yuma, Arizona and re-entered Northern Arizona University (Doc. 9. NAU Transcript); plaintiff asks for due process at Northern Arizona University-Yuma and was declined by the College of Education (Doc. 11. NAU Due Process); in a course taken to attain teacher certification, the following citations were presented (Doc. 12. School and Society):

> "Schooling is also a relatively simple concept but one that is often confused with education. Schooling simply refers to the totality of experiences that occur within the institution called school, not all of which are educational."

> "Training, like schooling, is often confused with education. Training may be described as a set of experiences provided to some organism (human or not) in an attempt to render its responses predictable according to the goals of the trainer."

Case 5:19-cv-04058-HLT-GEB Document 1 Filed 05/13/19 Page 11 of 37

"Education involves reason, the intellect, intuition, creativity. It is a process or set of experiences that allows humans to "create" themselves." Steven E. Tozer, Guy Senese, Paul C. Violas, Late of, *School and Society, Historical and Contemporary Perspectives* 7-9 (Penina Braffman mg. dev. ed., McGraw-Hill Education 2009, 6th Ed.) (1993);

"To exercise the ability to respond as a citizen to real examples of critical issues as they present themselves in a democratic society", this from the course syllabus with the above mentioned text, Course Objectives, EDF 301, Northern Arizona University-Yuma.

6. Homeless, plaintiff moves to a homeless shelter in Lawrence, Kansas in 2012 and in possession of certificates and credentials equivalent to undergraduate-work and life experience, master's and Ph.D. in elementary education, Ph.D. was unknown at this time, and most likely early childhood and special education-meeting 'evidence'-based methods in teaching in a majority to totality (textual references) and standards exemplified in Council on Exceptional Children (C.E.C.), N.A.E.Y.C.- National Association for the Education of Young Children, N.C.A.T.E.(C.A.E.P.)- Council for the Accreditation of Educator Preparation.

11

7. Plaintiff ended all baselines necessary to perform directly essential

functions as a teacher, May 13, 2013; at approximately the similar

time, plaintiff retrieved information from the Office of Personnel

Management: The Office of Personnel Management's Guidelines,

Classification & Qualifications General Schedule Qualification

Policies, *Acceptability of Higher Education for Meeting Minimum*

*Qualification Requirements,* states the following,

> "*2. Non-Accredited / Other*— This category
> includes institutions that do not meet the criteria
> above but offer a curriculum which is equivalent
> to "conventional/accredited institutions." Such
> institutions are either outside the jurisdiction, or
> have decided not to seek accreditation from
> accrediting bodies recognized by the Secretary of
> the Defendant. Examples of "Non-
> Accredited/Other" education or institutions
> include, but are not limited to:
>
>    i. Foreign education [see paragraph (c) below];
>   ii. Non-accredited military education or
>      schools;
>  iii. Continuing education units; or
>  iv. Academic credit for work or life experience"
>     (https://www.opm.gov/; then follow "Policy"
>     dropdown menu; follow "Classification &
>     Qualification" hyperlink, follow "General
>     Policies" tab; then follow "Application of

Qualifications Standards" hyperlink; then
follow "Educational and Training Provisions
or Requirements" hyperlink).

8. In 2014, Plaintiff enters Western Governors University, WGU, (Doc.

13. WGU Transcript) and is reprimanded, disposition concern-lack of

professionalism, September of 2014, and then denied readmissions

on a permanent basis (Doc. 14. WGU Correspondence(s)), after at

least two other semesters pass before the plaintiff was notified he

failed to meet criteria with regard to this disposition concern; the

admissions application does not take into consideration professional

level knowledge, skills, trainings, experience; plaintiff reinitiated

baselines after retrieving information for an online program of study,

WGU; the baselines were redundant and omitted; after being denied

re-admittance and banned for life-seemingly, plaintiff gained honors

society status at WGU; in a course required by WGU, plaintiff

retrieves the following (Doc. 15. Slavin), other citations could be

presented validating plaintiff's professional position- Norman E.

Gronlund and C. Keith Waugh, *Assessment of Student Achievement*,

45-47, (Jeffrey Johnston, V.P and Ed. in Chief, Pearson Education,

Inc, 2009, 9th Edition):

"One major issue in the interpretation of standardized test scores is the possibility of bias against students from low-income or diverse backgrounds (Lissitz & Schafer, 2002; Suzuki, Ponterotto, & Mueller, 2000). A test that gave an unfair advantage to one or another category of student could not be considered valid. Of greatest concern is the possibility that tests could be biased because their items assess knowledge or skills that are common to one group or culture but not another". Robert E. Slavin, *Educational Psychology Theory and Practice* 475 (Christian Shangraw dev. ed, Pearson Education, Inc., 2009, 9th Ed.)(1986);

9. Plaintiff's "Professional development" included the baselines, periods

of observation to gain information-similar to Bronfenbrenner's

ecological model/theory, he began as a child, in September of 1972

with concentrations in Education: special education, early childhood

education, elementary education, and English Language Learner

populations, and continued until 2013; plaintiff pursued 'harmony'-

not favoring populations, with these populations in three different

educational avenues, work experience, life experience and traditional

forms of educations; baselines included, but were not limited to,

contexts that could mandate failure from individuals

assessed/supported, which included psychiatric hospitals, homeless

14

shelters, Intermediate Care Facilities for Developmental Disabled/Mentally Retarded, homelessness, low-income, individuals with developmental disabilities, poverty, restraint systems, trainings including CPR and First Aid, potential English Language Learner programs, definitions of professional development from 20 U.S.C.A. Chapter §7801(42)(A),(B)(i)(I-III),(B)(iii), (B)(iv),(B)(vi)(I-II),(B)(ix),(B)(xii-xviii)(2017), 20 United States Code, U.S.C., §1400 et seq.-functional behavior analyses, valid and reliable assessment, referrals to special education services, and other services/supports-cultural differences in background (resilience), 42 C.F.R. §441.155, continuity of care between programs and services with community supports (not limited to psychiatric facilities), and included international, national, regional, States, statewide, county, and local agencies; "Professional development" amassed was 13,914.4 college credits, reference only, from Missouri 5 CSR 20-400.260) with 5,096.4 hours of college credit considered by plaintiff to be a basic education with combinations of education, experience, and/or training until age 18; the total amount of hours to reach a non-biased context for assessment is 132,270 hours (8818 multiplied by 15 hours per college

credit for professional development-Missouri 5 CSR 20-400.260);

plaintiff's "professional development" continued until all fallacies,

short-sighted logic, including but not limited to logical and

psychological fallacies in assessment (context), including financial

bias, were removed; the last bias within plaintiff's context was the

ability to sustain physical activity so the lack of physical interaction

did not jeopardize the welfare of the ones assessed and/or mandate

failure and alleviated by plaintiff through participation in

competitive swimming (and athletics) for 16 years and sustained by

bicycling to and from employment for, approximately, the last 25

years; plaintiff has participated with approximately 80 employers,

some more than once, according to the Social Security's Certification

of Extract from Records (Doc. 16. Extract) to safeguard individuals

assessed and potential employment; no coursework was used to gain

an employment position of greater compensation or authority since

1989.

10.    A Foreign Credential Evaluation (Doc. 17. Foreign Credential)

was performed on the plaintiff, 8 C.F.R.§ 214.2(h)(4)(iii)(C)(4)(1995-

2017) as proscribed in 8 C.F.R.§ 214.2(h)(4)(iii)(D)(1995-2017),

equating the education, experience, and training of plaintiff to an undergraduate degree in special education even though plaintiff is an United States citizen (evaluation is from hindsight and contains errors both by evaluator and by plaintiff-dates/times/employers and not applications to those assisted); this occurred in 2010, approximately four years after retrieving information on 8 C.F.R. Part 214:

A nonimmigrant may

"...have education, specialized training, and/or progressively responsible experience that is equivalent to completion of a United States baccalaureate or higher degree in the specialty occupation, and have recognition of expertise in the specialty through progressively responsible positions directly related to the specialty." 8 C.F.R. §214.2 (h)(4)(iii)(C)(4)(1995-2018) and 8 C.F.R.§ 214.2 (h)(4)(iii)(D) (1995-2018);

plaintiff has pursued employment with particular Universities and has met ALL criteria to attain a Master's and/or Ph.D. in elementary education, Vacancy ID: 1440402 at USAJOBS, Elementary Education Professor-Haskell University.

Case 3:18-cv-01234-ABC-DEF Document 1 Filed 03/13/18 Page 18 of 37

11.   On March 3, 2016, plaintiff researches information on 20 U.S.C.
(2014) and retrieves § 6736. Limitation on liability for teachers (a)
Liability protection for teachers (1-4), Paul D. Coverdell Teacher
Protection Act.

12.   On December 27, 2016, plaintiff received a correspondence from
the United States Department of Education stating a total balance,
defaulted student loans, including interest, of $45,240.91 is due and
was dated December 21, 2016 and was due in 60 days; plaintiff
cannot use coursework professionally due to invalidity of
assessments taken by university personnel, 20 U.S.C.  §1414
(b)(3)(A)(iii)-valid and reliable assessment for those receiving funding
for 20 U.S.C. 1400 et seq.

13.   Plaintiff sends a dispute of defaulted student loans on three
different occasions culminating in April 2017 and sends identical
materials to the Secretary of Education shortly thereafter (all
materials were administered as if the plaintiff had Intellectual
Disability and/or Mental Retardation-university required plaintiff to
eliminate work/life experience in gaining "college credit" and achieve
the proscribed curriculum); the Department of Justice sends a

correspondence soon thereafter to the plaintiff stating the plaintiff describes decades of discrimination (correspondence equaled just over a page in length) with no statute(s) as reference; plaintiff destroys correspondence in haste; plaintiff has not been pursued to repay defaulted student loans by U.S. Department of Education unless plaintiff initiates correspondence.

14.    On August 2, 2018, plaintiff researches the following information: "A freedom...that must await the Government's favorable response to a "Mother, may I?" is no freedom...at all." 517 U. S. 186, 245 (1996) *Morse v. Republican Party of Va.*, Scalia, J., dissenting.

15.    On January 21, 2019, plaintiff sent an email to University of Illinois-Champaign/Urbana, Southern Illinois University-Carbondale, and Northern Arizona University-Flagstaff admissions and to Western Governors University student services asking- "I just wanted to know under/from what context do education, experience (work/life) and/or training equate to a college degree" (Doc. 18. Question); On January 22, 2019, plaintiff contacted University of Arizona-Tucson and asked the same question, (Doc. 18. Question);

plaintiff asked for this information to apply in a non-discriminatory

manner.

16.    Three Universities responded within one week, University of

Illinois-Champaign/Urbana, Western Governors University, and

Southern Illinois University-Carbondale (Doc. 19. Replies); the other

two universities have not responded.

17.    On February 2, 2019, plaintiff researched occupations in which

foreign nationals, non-immigrants, may seek to gain employment

(https://www.foreignlaborcert.doleta.gov/perm.cfm; click on Appendix

A Professional Occupations under Helpful Links); Appendix A, F.R.

77377 through 77384 Vol. 69 No. 247, issued in 2004; Under Helpful

Links, same website, one receives information on "Schedule A

Occupations"; these are divided into two groups, Group II provides

the following information:

> "Sciences or arts (except performing arts) - Aliens
> (except for aliens in the performing arts) of
> exceptional ability in the sciences or arts
> including college and university teachers of
> exceptional ability who have been practicing their
> science or art during the year prior to application
> and who intend to practice the same science or
> art in the United States. For purposes of this
> group, the term "science or art" means any field

of knowledge and/or skill with respect to which colleges and universities commonly offer specialized courses leading to a degree in the knowledge and/or skill. **An alien, however, need not have studied at a college or university in order to qualify for the Group II occupation.**"

18.     On February 7, 2019, plaintiff reviews information in F.R. 77345,

Vol. 69, No. 247:

"...(1) Definition of Professional and Nonprofessional Occupations AILA maintained the definition of professional occupation should not be limited to an occupation for which the attainment of a bachelor's degree is a usual requirement because it neglects individuals who gain professional expertise through work experience instead of education. **To set the standard between professional and nonprofessional based on whether the person has a bachelor's degree or not is arbitrary and does not reflect the real world or take into account individuals who have gained professional expertise through work experience instead of education.** AILA suggested we should create a broader, more realistic definition for professional and nonprofessional occupations, such as an occupation for which the attainment of a bachelor's or equivalent is the usual requirement for the position."

19. On February 26, 2019, the plaintiff files a complaint with the
Office of Civil Rights against the universities aforementioned, albeit
somewhat obtusely (coping skills used by plaintiff resurfaced after
completing everything necessary to safeguard professional
applications); no response has been made.

20. Shortly after the filing with the Office of Civil Rights, plaintiff
researches information in Illinois and finds 110 ILCS 160, "Credit for
Prior Learning Act", effective 1-1-18:

> ""Credit for prior learning" means the evaluation
> and assessment of a student's life learning
> through employment, training, and experiences
> outside an academic environment from which
> skills that comprise terminal objectives are
> mastered to an acceptable degree of proficiency
> for college credit, certification, or advanced
> standing toward further education or training.
> "Public university" means the University of
> Illinois, Southern Illinois University, Chicago
> State University, Eastern Illinois University,
> Governors State University, Illinois State
> University, Northeastern Illinois University,
> Northern Illinois University, Western Illinois
> University, or any other public university or
> college, other than a community college, now or
> hereafter established or authorized by the
> General Assembly." 110 ILCS 160/5.

21.   May 8 to May 10, 2019, plaintiff contacts Southern Illinois
University-Carbondale and requests information on life/work
experience and its corresponding degree attainment possibilities, and
is informed the University does not perform these functions for
teacher certification. (Doc. 20. May 8, 2019).

22.   In May of 2019, plaintiff researches information on state
institutions in Arizona and Utah and retrieves information stating
the University of Arizona-Tucson and Northern Arizona University-
Flagstaff are state institutions, Arizona Revised Statutes, A.R.S., 15-
1601: "A.   The Arizona board of regents shall maintain state
universities at Flagstaff in Coconino county, at Tempe in Maricopa
county and at Tucson in Pima county, and the universities are
respectively designated northern Arizona university, Arizona state
university and the university of Arizona." Western Governors
University-Utah is found to be a private institution.

23.   June 5, 2019, plaintiff contacts the University of Illinois-
Champaign/Urbana and requests information on life/work experience
and its corresponding degree attainment possibilities, and is

informed the University does not perform these functions. (Doc. 21.
June 5, 2019).

24.     Plaintiff retrieves information on 34 Code of Federal Regulations,
C.F.R., Part 100, in 2019, 34 C.F.R. §100.5: "Illustrative application.
(g) A recipient may not take action that is calculated to bring about
indirectly what this regulation forbids it to accomplish directly"; 34
C.F.R. Part 100 is the effectuation of Title VI of the Civil Rights Act
of 1964, also researched this requirement for 2019, same
requirement is made for 2019.

25.     Plaintiff formally withdraws Office of Civil Rights complaints filed
against universities aforementioned, on June 4, 2019, improper
venue, and informs the Office of Civil Rights of the intent to file in
Federal district court in its due time; plaintiff has received no
correspondence from the Office of Civil Rights.

26.     On June 16, 2019, plaintiff contacts each university president
informing them of the potential filing in federal district court and
provides facts similar to those listed above (Doc. 22. June 16, 2019);
no contact has been made by the recipients.

27. Week beginning September 13, 2019, plaintiff researches

obligations of Title VI at each aforementioned University, federally

funded with each University stating compliance with Title VI is a

requisite/mandate or compliance with federal definitions of

discrimination are upheld by the University.

28. On September 27, 2019, plaintiff receives an email solicitation

from Western Governors University detailing Frequently Asked

Questions and the following question and statement: "What would

you like to study? Let us know here what you're interested in, and

we'll reach out to help you take the next step"; on October 11, 2019,

plaintiff receives email from Western Governors University titled

"Top 4 Reasons WGU is Unique" and "Request more information

about your degree program of interest. Or, if you're ready to start the

application process, you can apply today for free! Use code

APPLYFREE to waive the $65 application fee"; plaintiff also receives

an additional 8 similar emails dating back to July 2019.

29. On July 12, 2018 plaintiff downloads Kansas Act Against

Discrimination and retrieves, Kansas Statutes Annotated, K.S.A.,

44-1009(c)(2) "For any person, whether or not specifically enjoined

from discriminating under any provisions of this act, to aid, abet,

incite, compel or coerce the doing of any of the acts forbidden under

this act, or to attempt to do so";

44-1009 (a) "It shall be an unlawful employment practice:

> (1) For an employer, because of the race, religion,
> color, sex; disability, national origin or ancestry of
> any person, to refuse to hire or employ such
> person to bar or discharge such person from
> employment or to otherwise discriminate against
> such person in compensation or in terms,
> conditions, or privileges of employment; to limit,
> segregate, separate, classify or make any
> distinction in regards to employees; or to follow
> any employment procedure or practice which, in
> fact, results in discrimination, segregation or
> separation without a valid business necessity";

and 44-1005(i)

> "Any complaint filed pursuant to this act must be
> so filed within six months after the alleged act of
> discrimination, unless the act complained of
> constitutes a continuing pattern or practice of
> discrimination in which event it will be from the
> last act of discrimination."

30.   On May 22, 2019 plaintiff researched 408 U.S. 593, 597 Perry et

al. v. Sindermann (1971):

> "For at least a quarter-century, this Court has
> made clear that even though a person has no
> "right" to a valuable governmental benefit and
> even though the government may deny him the

benefit for any number of reasons, there-are some
reasons upon which the government may not rely.
It may not deny a benefit to a person on a basis
that infringes his constitutionally protected
interests-especially, -his interest in freedom of
speech. For if the government could deny a
benefit to a person because of his constitutionally
protected speech or associations, his exercise of
those freedoms would in effect be penalized and
inhibited. This would allow the government to
"produce a result which [it] could not command
directly." *Speiser v. Randall*, 357 U. S. 513, 526.
Such interference with constitutional rights is
impermissible."

31.  On October 3, 2019, plaintiff downloads a Title VI manual from

the Department of Justice website and retrieves information on

*Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180 (4th

Cir. 1999), "In addition, finding no state statute comparable to Title

VI, the court concluded that the applicable limitation period of that

applied to personal injuries.  Id. at 187."

32.  On October 10, 2019, plaintiff contacted Southern Illinois

University-Carbondale by phone and asked the first and last name of

the president of Southern Illinois University.  J. Kevin Dorsey M.D.,

Ph.D was mentioned.

**B. Claim.**

Case 1:18-cv-00900-YK-LSF Document 1 Filed 03/05/18 Page 28 of 37

Plaintiff hereby incorporates by reference all paragraphs and all sub-elements of any paragraph containing a sub-element of Statement of Claim Section A. as if set out in full herein and made a part hereof.

University of Illinois-Champaign/Urbana, University of Arizona-Tucson, Southern Illinois University-Carbondale, Northern Arizona University-Flagstaff, and Western Governors University-Utah violated 42 U.S.C. §2000d by excluding the plaintiff, an United States citizen, from participation in a program receiving federal financial assistance by reason of national origin, denied the plaintiff the benefits of a program receiving federal financial assistance by reason of national origin, and subjected the plaintiff to discrimination by reason of national origin through failure to provide non-discriminatory admissions requirements (work/life experience equitable to degree standing) to an United States citizen, the plaintiff, comparable to that of a foreign national, non-immigrant.

## IV. Relief.

A. Plaintiff requests all universities aforementioned as defendants to adopt non-discriminatory admissions practices, as effectuated in 34 C.F.R. Part 100, consistent with the benefits of the program and its

28

corresponding college entrance requirements, ie. College of Education, College of Business, et cetera, which includes work and/or life experience.

B. Plaintiff requests his remaining defaulted student loans be declared void.

C. Plaintiff requests the universities aforementioned allow secondary students the enjoyment of their college preparatory programs as valid college coursework with the implementation of their corresponding Grad Point Average.

IV. Do you claim the wrongs alleged in your complaint are continuing to occur at the present time? Yes

V. Do you claim actual damages for the acts alleged in your complaint? Yes

VI. Do you claim punitive monetary damages? No
If you answered yes, state the amounts claimed and the reasons you claim you are entitled to recover money damages.

An injury is the illegal invasion of a legal right. See *Bowman v. City of Davenport*, 243 Iowa 1135, 53 N.W.2d 249, 63 A.L.R.2d 853 (1952) (discriminatory admissions applications); damage is the loss, hurt, or

29

harm that results from the injury, See *Hanna v. Martin*, 49 So. 2d

585(Fla. 1950) (incapacity of plaintiff to perform at professional level

due to injury at any all levels of education/certification). A teacher is

entitled to rely on the certificate as substantive proof of his or her

qualifications to teach the subjects endorsed, *Bauer v. Board of Educ.,*

*Unified School Dist. No. 452*, Johnson, Kan., 244 Kan. 6, 765 P.2d 1129,

50 Ed. Law Rep. 1255 (1988), and educational authorities have the

burden of establishing by substantial evidence the nonexistence of the

presumption that a certified teacher is qualified. *Id.* The substantial

evidence necessary for the plaintiff to enter (also maintain and practice)

the profession of teaching is impossible to attain under the context

presented by the defendant(s) due to the discriminatory conduct in

admissions (favoring the foreign national over a United States Citizen

in admissions and invalidating all assessments on the plaintiff-even

when the plaintiff responded to validate his own attainment and

potentially that of his "authorities") and the prolonged nature of the

discriminatory violations imposed on the plaintiff. *Fuller v. Rayburn*,

161 F.3d 516, 518 (8th Cir. 1998) (concluding "Title VI generally

permits recovery of damages for intentional discrimination"). To

establish a prima facie case under Title VI, a plaintiff must demonstrate that her race, color, or national origin was the motive for the discriminatory conduct. *Thompson v. Bd. of Special Sch. Dist. No. 1*, 144 F.3d 574, 578-79 (8th Cir. 1998).

Monetary Damages are listed below:

Teacher salary for remaining of life-not to exceed beyond 68 years of age: the average salary, lowest rate, of Kansas in 2017-2018 according to USD 497's Master Agreement, Salary Schedule, is $44,458. Twenty years of teaching remaining at $44,458 per year is a total of $889,160-all defendant(s) (information received by local human resources on October 2, 2019).

Benefits- corresponding financial equivalent of retirement, insurance, vacation and sick pay from all defendant(s), not to exceed $100,000 from all defendants.

In November 2018, plaintiff seeks information from a local school district on the rate of pay for professional development: "For PD outside the duty day, the rate we pay teachers is $21/hour. If the PD is held during the duty day, it's paid at the teacher's hourly rate." On October

2, 2019, plaintiff is informed of hourly rate of teachers, 186 days at 8 hours per day. Plaintiff takes the average of first year teachers Bachelors, Masters, and Ph.D. (only three) from the salary schedule of the Master Agreement from www.usd497.org; this average is $30.53/hour (Reasoning: not all applications equate to a Ph.D., some require only a Bachelors, some Masters, and some application require little to no education-only experience). Since the plaintiff was "required", at least professionally, to complete the baselines to create a context which should have been afforded him in 1988, the $30.53/hour is enjoyed in calculation; this includes overtime, also an enjoyment. This calculation does not include an approximate additional 10,000 hours of work needed to solidify the baselines taken-basic educations both before and after its completion.

The first week March 22, 1989 to March 25, 1989 is four days at 15 hours per day; this is 60 hours. The forty hours at $30.53/hour is $1221.20. The twenty additional hours at $45.795 is $915.90. The total is $2137.10 for the first week. For 65 hours of overtime for the remaining full weeks will be $2976.675 with the addition of the forty hours at $30.53/hour or $1221.20; the total for a full week of said

"professional development" is $4197.875. From March 26, 1989 to May 13, 2019 is twenty four years, 1 month, 2 weeks, 3 days or $5,264,135.25, approximately.

The plaintiff is seeking early childhood, elementary, special education, and/or English Language Learners in which the "professional development" was necessary for the plaintiff to apply at professional level.

University of Illinois-Champaign/Urbana: (2 Early Childhood-1 undergraduate and 1 graduate; 2 Elementary-1 undergraduate and 1 graduate; 3 Special Education-1 undergraduate and 2 graduate): $36,848,946.75: That is the $5,264,135.25 multiplied by the programs of study in which the plaintiff is otherwise qualified. This again is multiplied by the three counts of discrimination, each of which are different acts/counts and different damages. Total is $110,546,840.25. Plaintiff also requests his two "letterman" jackets, from swimming, be reissued due to the loss of each during the administered baselines- one for the first year and one for the second year.

University of Arizona-Tucson (1 undergraduate in each area- early childhood, elementary and special education, 2 graduate special education): $26,320,676.25: That is the $5,264,135.25 multiplied by the programs of study in which the plaintiff is otherwise qualified. This again is multiplied by the three counts of discrimination, each of which are different acts/counts and different damages. Total is $78,962,028.75.

Southern Illinois University-Carbondale (early childhood-1 undergraduate, elementary- 1 undergraduate, special education-1 undergraduate; 2 graduate degrees in education). $26,320,676.25: That is the $5,264,135.25 multiplied by the programs of study in which the plaintiff is otherwise qualified. This again is multiplied by the three counts of discrimination, each of which are different acts/counts and different damages. Total is $78,962,028.75.

Northern Arizona University-Flagstaff (1 undergraduate in early childhood, 1 undergraduate and 1 graduate in elementary and 1 undergraduate and 2 graduate special education): $31,584,811.50: That is the $5,264,135.25 multiplied by the programs of study in which the plaintiff is otherwise qualified. This again is multiplied by the three

counts of discrimination, each of which are different acts/counts and different damages. Total is $94,754,434.50.

Western Governors University-Utah (3 undergraduate and 2 graduate): $26,320,676.25: That is the $5,264,135.25 multiplied by the programs of study in which the plaintiff is otherwise qualified. This again is multiplied by the three counts of discrimination, each of which are different acts/counts and different damages. Total is $78,962,028.75.

## VIII. Administrative Procedures:

A. Have the claims which you make in this civil action been presented through any type of Administrative Procedure within any government agency? Yes [X]  No [X]

B. If you answered yes, give the date your claims were presented, how they were presented, and the result of that procedure:

Plaintiff filed with the Office of Civil Rights February 26 of 2019; no response was provided by the Office of Civil Rights.

C.  If you answered no, give the reasons, if any, why the claims made in this action have not been presented through Administrative Procedures:

Plaintiff formally withdrew complaint June 4, 2019 and informs the Office of Civil Rights he will be filing in a federal district court, improper venue.

### IX. Related Litigation:

Please mark the statement that pertains to this case:

X Neither this cause, nor a substantially equivalent complaint, previously has been filed in this court, and therefore this case may be opened as an original proceeding.

Date: October 16, 2019

Kent Thomas Warren, Pro Se

1301 W. 24th St. E18

Lawrence, KS 66046

785-592-0259

warrenknt@aol.com

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates { [ ]Wichita, [ ]Kansas City , or [X]Topeka} , Kansas as the location for the trial in this matter.



_____ Signature of Plaintiff

REQUEST FOR TRIAL BY JURY

Plaintiff requests trial by jury {[ ]Yes or  [x]No}

_____ Signature of Plaintiff

Dated: October 16, 2019   (Rev. 10/15)